Carskaddon v. Kennedy.

BENJAMIN W. CARSKADDON, appellant,

v.

THOMAS KENNEDY, respondent.

1. It is not essential to the enforcement of a contract for the sale of lands that it should be signed by the complainant, as well as by the defendant.

2. A contract induced by fraudulent representations would not be enforced in equity, even though it appeared that the parties did not intend to make the representations a part of the contract.

3. If a party refuse a tender of the purchase-money for land sold, on the express ground that he is not bound to make any conveyance, he cannot, afterwards, object to the propriety of the tender, on the ground that the description of the land, in a deed which the purchaser, at the time of the tender, requested him to execute, was erroneous.

4. Oral evidence is not competent to establish an agreement to change the description of land previously bargained for by a written contract signed by the vendor.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions :

The complainant exhibits a written contract executed by the defendant only, bearing date the 17th of September, 1880, in and by which he agreed, in consideration of $250 in hand paid, and the further sum of $7,250, to be paid by the complainant upon the execution and delivery of a conveyance as thereinafter named, within thirty days from the date of said agreement, to execute and deliver to the complainant, his heirs and assigns, a proper deed of conveyance in fee simple, clear of all encumbrances, to a tract of land in the township of Berkley, in the county of Ocean, containing one hundred and fifty acres or more, not less, bounded on the south by lands of Samuel Shreve, on the east by the low-water mark of the Atlantic ocean, on the west by the low-water mark of Barnegat bay, and on the north by the remaining lands of defendant. The agreement specially

provided for the location of the northern boundary line, which was afterwards modified by the parties, and concludes as follows :

"And it is further understood that the said Thomas Kennedy agrees to sell the said tract of land at a lower price than he otherwise would, on account of the increase of value to his remaining land by improvements to be made on the land hereby agreed to be conveyed ; and the said Benjamin W. Carskaddon hereby agrees to expend an amount not less than $10,000 in improving the said tract of land within one year from the date of the delivery of the above-mentioned deed, and in default of his so doing he will pay to the said Thomas Kennedy, his executors, administrators and assigns, the sum of $5,000 immediately after the termination of said year, as stipulated damages and not as penalty."

The bill alleges that the complainant prepared a deed embracing the premises referred to for the defendant and his wife to execute, and endeavored, on the 16th day of October then next, to find the defendant, both at his place of business and of abode, with the deed and with the balance of the purchase-money ($7,250), for the purpose of tendering himself ready and willing to perform the agreement on his part, but that he failed to find the defendant; and that on Monday, the 18th of October, he called upon the said defendant, tendered him the deed for the land and the balance of the purchase-money, upon his executing the deed and delivering it to the complainant, at the same time requesting the defendant to perform the said agreement, and to execute and deliver said deed and accept the said money, to do which the defendant refused. The complainant tenders himself ready to comply, and asks that the defendant may be compelled to perform his agreement.

The defendant admits the execution of the agreement, but insists that he was induced to do so by fraud and false representations. From the answer it appears that the defendant, being on the premises, met one Scott, who made inquiries respecting the sale of the property, and said that some parties in New York wished him to purchase some land for them on the beach, and that they wished to purchase one-half the lands of defendant at Seaside Park ; and that said Scott said that these New York parties were men of wealth and would immediately make ex-

tensive and expensive improvements, and would expend $500,-000 in such improvements on the portion they wished to purchase, and would make it a second Coney Island; and that these representations induced him to consider the proposition favorably; and that shortly after this, Scott and the defendant met in Philadelphia, and Scott introduced him to the complainant; that complainant then represented that he was an agent and real estate broker of Philadelphia, and represented New York wealthy capitalists who wished to purchase one-half of the defendant's property at Seaside Park, upon which they would immediately expend large sums of money in making improvements, and would build a city thereon, making it a second Coney Island; and that Scott, at this meeting, reiterated his former statements, and that defendant desired to know who the New York parties were, whose names the defendant refused to disclose, promising, however, to do so before the deed was delivered; and that the defendant was overcome by the solicitations of Scott and complainant, and being weak of sickness he consented to accept the proposition of the complainant, but declined to enter into the agreement at the place in which they then were, but would go to the office of his brother-in-law, J. Howard Gendell, an attorney-at-law, and that there the agreement mentioned in the bill was entered into by the defendant; and that on Friday, the 15th of October, the complainant and defendant met, when complainant informed defendant that he had prepared a deed for the land, and asked defendant if he would be in Philadelphia the next day, the 16th of October, and that defendant said to complainant that he was troubled with his eye, and if that was better he expected to leave the city, and perhaps would not return until Monday; and that defendant did leave the city on a 6:30 A. M. train for Toms River, and remained there at Seaside Park until the following Monday.

The answer denies that there was a tender by the complainant within the thirty days, as required by the agreement; that said complainant was not a real estate agent and broker, but a clerk in the Pennsylvania railroad office, and of no financial ability, and that he was not the agent of any New York parties.

The answer sets up that a railroad is to be built through these lands, whereby the land has become much more valuable, and that nothing was done by said complainant in regard to said agreement until after the fact that said railroad would be built was established.

The answer insists that there is a want of mutuality because the complainant did not join in the execution of the agreement, and that his excuse for not doing so at the time was because of the late hour in the day, but that he promised the defendant that he would sign it; that he, the defendant, would make a copy, and sign a memorandum, at the bottom, acknowledging his obligations, and that this he never did.

I conclude that the complainant made a reasonable effort on his part to effect a performance of the contract within the thirty days. The last day, numerically speaking, for performance, was Sunday; but the law would not notice anything as lawfully done that might be attempted on that day. On Saturday the complainant went to the place of business, and to the house of the defendant, with a deed for the premises in blank, and the balance of the purchase-money, inquired for the defendant, and tendered himself ready and willing to perform the agreement. The defendant was not at home, nor in the city. Being home on Monday, the 18th, a deed was tendered to the defendant for him to execute, and so, also, were the $7,250 tendered. I think that the law demands nothing more of the complainant.

Then how does the case stand on the question of fraud and misrepresentation? It is said that both Scott and complainant represented themselves as being agents of wealthy New York capitalists who would, if they succeeded in obtaining title to this land, spend $500,000 on it and make it a second Coney Island. The complainant also said that he was a real estate agent and broker. As to the extent of the contemplated improvements, I can only regard the language as simple commendation, so verbose and fulsome as not in the least calculated to mislead any one. As to the declaration respecting the New York capitalists, it may be said to be shorn of its force by the fair presumption that the defendant did not rely upon the general preliminary talk

Carskaddon v. Kennedy.

on this branch of the subject, for, at the time the agreement was made, he was content with the promise of the complainant to give him the names of the persons interested at the time of the delivery of the deed, and with the condition in the agreement that $10,000 worth of improvements should be put on the premises.

It is evident to my mind, as I understand the testimony, that the defendant did not depend on the comprehensive phrase "wealthy New York capitalists," but, as above stated, intended to rely on demanding the names of particular individuals when the agreement was about to be enforced, and the advantages arising from the expenditure of $10,000. Nor am I impressed with the defence that the complainant represented himself as a real estate agent and broker, for there is not a scintilla of evidence that such statement was made to increase his credit with the complainant, or that it did, in the slightest, increase his credit with him. There is no evidence that a real estate agent and broker is necessarily a man of the highest integrity and responsibility. These remarks are not made to shield or excuse the falsifier, but because the fact is pressed upon the attention of the court, and because it has not been made to appear that what was said was or is material, and also because there is no proof to satisfy me that the defendant relied upon such declarations. I look in vain for testimony showing that the contract would not have been made had it been known that the complainant was not an agent or real estate broker. I think when the party complaining of misrepresentations does not establish that he was influenced by them, the law offers no relief to him. I can find nothing in the case that shows that the slightest importance was attached to the business of complainant.

In the next place it is urged that there is such want of mutuality in this case as to forbid the enforcement of this contract. It was signed by the defendant, the vendor, only. Whatever the rule on this subject may have once been, there is no longer any doubt but that the great weight of authority declares a contract binding, not within the statute of frauds, although only signed by one of the parties, when the other files his bill for specific per-

formance. *Richards* v. *Green, 8 C. E. Gr. 536 ;* see, also, chancellor's opinion, *S. C., Id. 32 ; Waterman on Spec. Perf. of Contracts* § *211 ; Reynolds* v. *O'Neil, 11 C. E. Gr. 223.*

But I regard as much more serious, the manner in which the defendant's signature was obtained. The parties had been talking over the terms of the contract for some time, in the presence of Mr. Gendell, before the terms were fixed. An agreement was then drawn by the complainant, which was submitted to Mr. Gendell, who insisted, in the interest of the defendant, that the clause above quoted should be inserted, which was consented to by the complainant. The complainant then drew another agreement in all respects like the former, except said clause, which was added to the second one. This one was shown to Mr. Gendell when he first discovered that it was intended to be unilateral, and objected to the defendant signing unless another was drawn in the name of the complainant for him to sign. Because the day had so nearly passed, this was waived upon the promise of the complainant that, after the defendant should sign and acknowledge his part, he (the complainant) would make a copy thereof, and express his consent, at the bottom, to be bound thereby. They went from the office of Mr. Gendell to find a commissioner to take the acknowledgment. After the defendant executed his part and acknowledged it, he delivered it to the complainant, and accepted the $250 without requiring the complainant first to copy the agreement, and to add thereto his written consent to be bound by its provisions, being satisfied with the promise of the complainant to do so thereafter.

If these were all the facts relating to this branch of the case, I should conclude that the defendant honestly relied on a copy of the agreement, with the complainant's consent to be bound thereby endorsed thereon, and that the complainant had resorted to a trick or device in the transaction, and, consequently, that the agreement had been unfairly obtained, and ought not to be enforced ; but there are other facts which change the complexion of this branch of the inquiry. Mr. Gendell says that he met the defendant the next week, and asked him where the agreement was, and was told that complainant had taken it to make a copy,

to which Mr. Gendell said, " he had done very wrong in letting the paper go out of his hands until he got an executed duplicate. If the railroad went through, Mr. Carskaddon had the agreement to enforce, while, if there was any hitch about it, and Carskaddon wanted to back out, he, Kennedy, had nothing to show for it; that I did not consider that the matter was complete until he got his executed copy, and that he had better hold off, and do nothing until he got it."

This makes it apparent that the defendant was fully informed as to his rights. His counsel said to him that he did not consider the matter complete until he got his "executed copy." After this he met the complainant several times before the expiration of the thirty days—once at his own house in the evening of the day that the agreement was signed, once at Seaside Park, and other times in Philadelphia, when the agreement, or the subject-matter of it, was referred to and talked about, and further, from the nature of which it was most manifest that the complainant was making every preparation to complete his contract. For example, at defendant's house they talked about the deed; at Seaside Park they have an understanding that the north line shall be extended so far north only as to include one hundred and fifty acres, instead of being limited at a certain point to be determined by the location of the streets, although more than one hundred and fifty acres should be embraced in reaching such point, while at Philadelphia a cloud upon the title by way of an uncanceled judgment was spoken of; yet the defendant does not once warn the complainant that, as he had not made and delivered to him a copy, no one was bound, and he should consider himself released. The complainant called on Mr. Gendell several times, and inquired for the deeds relating to the property. On the 15th of October the parties met; the complainant informed defendant that he had prepared a deed, and would be ready to pay the money on the next day; and, notwithstanding all these things, he did not say he was under no obligation, and would not carry out the contract.

I therefore conclude that the charge that the agreement was

unfairly obtained was an after-thought, and did not influence the defendant or his counsel and brother-in-law in proper time.

I cannot but conclude that, if the defendant regarded this as important, it was for some ulterior advantage to himself, at or after the day for performing the agreement. Counsel had told defendant that he "did not consider the matter complete until he got his executed copy, and he had better hold off." He had, on the evening of the day that the agreement was executed, refused, as he says, to allow the complainant to have his deed under which he held the property, because "he had not conformed to his agreement, and I suspected I was being sold." There, on the very day that he delivered his agreement to sell to the complainant, he had his suspicions aroused, and, in a few days thereafter, his counsel advised him to "hold off, and do nothing until he got it." A copy of the agreement, without any promise in writing, signed by the complainant, binding him, was handed to defendant's son, and by him handed to defendant, within two weeks after the original was delivered. After he got this copy, he met the complainant, if not before, certainly on the 15th of October, when, he says, complainant told him he had a deed for his examination, and continues:

"I asked him for it; I wanted to look at it; I think he said he hadn't it with him; I told him to show it to my son—he could examine it; he replied that he wished to give it to me; when could he see me; I told him I would be home that night; he asked if I would be home next day; I said if my eye was no better; that was all that was said about deed, papers or money; in fact, nothing was said about papers or money."

He also says:

"Not a word about money or agreement; of that I am positive."

Having had the copy of the agreement in his possession for about two weeks, and knowing what was required to bind the complainant, and the complainant then, October 15th, permitting the matter, by saying that he had prepared a deed for the premises, to prepare which a survey of the premises was necessary, which the defendant knew the complainant had had done, it was, I

Carskaddon v. Kennedy.

think, the plain duty of the defendant, especially since he was retaining the $250, which he had received as part payment, to inform the complainant that he no longer considered himself bound, because the contract was not mutual, in that he had failed to stipulate that he would perform on his part. Besides, if the defendant was honestly withdrawing from the further carrying out of his agreement, because of the alleged delinquency of the complainant, he would at once have paid back the $250. He knew the "matter was not complete;" he had "held off, and done nothing" for twenty-nine days, and then knew that the complainant had done all that it was possible for him to do in the premises, to bind himself, but yet he carefully "holds off" still. He does not say, "I will not wait with you any longer; take back your $250."

But I cannot discover anything at all in the case which leads me to believe that the defendant, at the time, placed his case on the ground that complainant had not signed. If that had been his dependence, most certainly he would have relied on it when the tender was made, on October 18th. As to the interview that took place then, he says :

"I told him that I would not have anything to do with it—the time had now passed; that the whole thing was a deception and misrepresentation, from the beginning to the end."

Making no mention of the failure of the complainant to bind himself.

These, I think, cover all the points formulated by the pleadings. But, out of the facts as presented, it is insisted that a question arises which must be decided against the complainant, and deprive him of a decree. It is said that the complainant took it upon himself to prepare a deed for the premises, and having done so, and not having described the premises properly, and having so described them as to include, practically, more land than the defendant had agreed to convey, he was guilty of such default as should carry the case against him. I do not think this binds him. I do not think it was his duty to prepare the deed. I have always understood that that duty devolved on the vendor.

I think the practice, in this respect, in New Jersey, is different from what it is in New York and some other states, and in England.    *Egbert* ads. *Chew*, 2 Gr. 446; *Huffman* v. *Hummer*, 3 C. E. Gr. 83.

A great deal of time was spent by counsel in disputation over the true location of the south line.   Considering that it was not the duty of the complainant to prepare the deed and describe the premises, all labor on this point at this time is unavailing, because premature.   The same remark is applicable to the alleged selection of "high-water mark" as the east and west line, rather than "low-water mark."   The terms of the agreement are plain and unmistakable.   It is the duty of the defendant to prepare, execute and deliver a deed for the land mentioned and described in the agreement, extending southward to the lands of Samuel Shreve, eastward to "low-water mark" of the Atlantic ocean, and westward to "low-water mark" of Barnegat bay.   If it is said that the defendant has not a perfect title to the land between high water and low water, the answer is that, with full knowledge, he made that a part of the contract.   The rights of the public to that ever-shifting belt are as notorious as the existence of the sea.

Were a vendor to come into equity and say he had purchased a farm, and the vendor agreed to give him a deed in fee simple for it, but there are public highways over it which cover eight or ten acres, and were to ask the court to compel the vendor to deed him other lands to the amount of eight or ten acres, equivalent to the roadway, and it should appear to the court that the vendee had a long time been well acquainted with the premises, and knew of the existence of the highways, it certainly would not only not hear his prayer, but would compel him to accept a deed for the premises described in the agreement, and to pay for the land, including the amount covered by the highway. *Brashier* v. *Gratz*, 6 Wheat. 528, 537.

But it is said that there is a dispute between the parties as to the location of the Shreve line.   Whether this shall prove serious or not, I cannot now determine; but, from the testimony, I think I am safe in saying that I cannot fix that line.   This being so,

Carskaddon *v.* Kennedy.

it would seem, under the law, to be my duty to advise a decree that the defendant convey the quantity of land agreed upon, one hundred and fifty acres north of the Shreve line, as ascertained by the surveys of the complainant. The defendant cannot ask the complainant to accept land, in whole or in part (except as to the parcels between high and low-water lines), the title to which is manifestly in doubt. He has expressly stipulated to the contrary. And the courts have, without exception, sustained this view.

I will advise a decree in accordance with these views. I will also advise a reference to a master to ascertain and fix the location of the lines at low water, on the basis of which the one hundred and fifty acres shall be settled.

The complainant is entitled to his costs.

*Benjamin D. Shreve* and *Samuel H. Grey*, for appellant.

The questions presented to the court are:

*First.* Was the decree directing that the appellant should specifically perform the agreement warranted by the pleadings and proofs?

*Second.* Could the court of chancery settle the boundary line between the appellant's lands and the lands of Samuel Shreve?

*Third.* Is not the decree in this case imperfect in that it does not compel the respondent to perform his agreement as to security that the improvements mentioned in said agreement would be made or damages paid? And does it not decree appellant to convey different land from that mentioned in the agreement, and to a party not the purchaser under the agreement?

The pleadings and evidence do not show that fair and just agreement which a court of equity will confirm, but show an agreement procured by misrepresentation and fraud that are sufficient to invalidate it, and conduct on the part of the respondent such as bars him personally from appearing before a court of equity.

The agreement signed by the appellant and sought to be specifically performed was obtained by fraud and misrepresentations of the respondent.

The respondent, at the time of and prior to the appellant's signing the agreement, represented himself, and informed the appellant, that he was a real estate agent and represented wealthy New York parties who were engaged in the developing of Long Island, and that they wished to purchase one-half of the appellant's land at Island Beach, and if appellant would sell unto them they would immediately make extensive improvements, spend large sums of money and make the portion they bought a second Coney Island, and thus greatly enhance the remaining part of appellant's land.

The respondent tendered a deed to appellant and demanded a conveyance to himself of certain lands, declaring that they were the lands mentioned in the agreement, and, on refusal to execute, filed the bill to compel specific performance; never demanded that appellant should make him a deed of the premises mentioned in said memorandum of agreement.

The lands described in the deed were not the lands to be conveyed by the agreement, but are located some four hundred feet north of the southern line in said agreement mentioned, and the southern lines consisted of two—one parallel with and the other at an angle with the northern line of appellant's lands.

The court of chancery should not have decreed the performance of the contract thus obtained by fraud and misrepresentation, but should have left respondent to his remedy at common law. *Waterman on Spec. Perf. 1.*

The enforcement of the specific performance of a contract is an exercise of the extraordinary jurisdiction of the court resting in sound discretion, and is not a matter of right. *Gariss* v. *Gariss*, 1 C. E. Gr. 79; *Peeler* v. *Levy,* 11 C. E. Gr. 330, 332; *Plummer* v. *Keppler*, 11 C. E. Gr. 481; *Stoutenburg* v. *Tompkins*, 1 Stock. 332; *Torrey* v. *Buck*, 1 Gr. Ch. 366; *King* v. *Morford*, Sax. 274; *Smith* v. *McVeigh*, 3 Stock. 239; *Locander* v. *Lounsbery*, 9 C. E. Gr. 417, 10 C. E. Gr. 554; *Johnson* v. *Hubbell*, 2 Stock. 332, 342.

The court is bound to see that it really does that complete justice which it aims at, and which is the ground of its jurisdiction. *King* v. *Morford*, Sax. 274.

Carskaddon v. Kennedy.

The strict rule is that the party who comes unto equity for a specific performance must come in with perfect propriety of conduct; otherwise he will be left to his remedy at law. *King* v. *Morford, Sax. 274, 281; Stoutenborg* v. *Tompkins, 1 Stock. 332; Johnson* v. *Somerville, 6 Stew. Eq. 152.*

If misrepresentations were made at the time, though not in writing, calculated to mislead in any essential particular, the party will be left to his remedy at law. *Miller* v. *Chetwood, 1 Gr. Ch. 199; Thompson* v. *Tod, Pet. C. C. 380, 385.*

The court will never interfere where the party has practiced any fraud or has been guilty of misrepresentations in any material particular. *Plummer* v. *Keppler, 11 C. E. Gr. 481, 482; Wuesthoff* v. *Seymour, 7 C. E. Gr. 66, 69; Scott* v. *Shiner, 12 C. E. Gr. 185; Stover* v. *Wood, 11 C. E. Gr. 417; Redmond* v. *Zilley, Sax. 320; Wakeman* v. *Dodd, 12 C. E. Gr. 564.*

When a person enters into an agreement on the faith of a misrepresentation made to him, the entire contract is thereby rendered invalid, it being impossible, in such a case, to determine how far the false statement may have operated to induce him to accept the proposition of the other party. *Waterman on Spec. Perf. (ed. 1881) 403 § 293; Woollam* v. *Hearn, 2 Lead. Cas. in Eq. (3d Am. ed.) 666, 667.*

Upon a bill for specific performance of a written agreement, it is competent for defendant to prove parol declarations made at the time of the contract, though not incorporated in the agreement, in order to rebut the complainant's equity. *Miller* v. *Chetwood, 1 Gr. Ch. 199, 201–207; Stoutenborg* v. *Tompkins, 1 Stock. 337, 338; Lead. Cas. in Eq. (2d ed. 1859) 660–662; 3 Lead. Cas. in Eq. (Am. ed. 1859) 670–677, 684–695.*

Evidence is admissible to prove fraud. *Stoutenborg* v. *Tompkins, 1 Stock. 332–337; Rittenhouse* v. *Tomlinson's Exrs., 12 C. E. Gr. 381; King* v. *Ruckman, 6 C. E. Gr. 605.*

In *Barebones* v. *Barnes, 2 Ch. Cas. 122,* decided July 22d, 1682, it is said: "For the suit arising upon an agreement in writing, that seems complicated with a fraudulent intent, to which the plaintiff himself was party, it is no way consonant to equity to favor iniquity by carrying such intent into an execu-

tion (see *1 Ch. Cas. 25, 30, 76 &c.*), for, though equity will relieve against fraud &c., yet he who is *particeps fraudis* shall have no relief." *Id. 97 &c.*; see, also, *Id. 202–302*; *Cardman* v. *Horner*, 18 *Ves.* 10; *Clermont* v. *Tasburg*, 1 *J. & W. 112, 119, 120*; *Robinson* v. *Wall*, 10 *Beav. 61*; *Marquis of Normandy* v *Duke of Devonshire*, 2 *Freem. 217*; *Jeremy Eq. Jur.* (*2d Am. ed.*) *443*; 1 *Story's Eq. Jur.* (*12th ed. 1877*) §§ *750 a, 769, 770*; *Pomeroy's Eq. Jur. 435* § *400*; *Davis* v. *Symonds*, 1 *Cox 407*; *Reynell* v. *Sprye*, 8 *Hare 222* note, and 1 *De G., M. & G. 691*; *Smith* v. *Wheatcraft*, *L. R.* (*9 Ch. Div.*) *230*; *Fellows* v. *Lord Gwydyr*, 1 *Russ. & Myl. 83*; *Hopham* v. *Eyre*, *Lofft 787*; *Scott* v. *Langstaffe*, *Id. 798*; *Phillips* v. *Duke of Buckingham*, 1 *Vern. 227*; *Bonnett* v. *Sadler*, 14 *Ves. 526*; *O'Herlihy* v. *Hodges*, 1 *Sch. & Lef. 123*; *Ex parte Dyster*, 1 *Mos. 155*, 2 *Rose 349*; *Story's Eq. Jur.* (*12th ed.*) §§ *191, 192*; *Waterman on Spec. Perf.* § *235*.

Payment of money is not part performance. *1 Story Eq. Jur.* (*8th ed.*) § *760*; *Clinton* v. *Cooke*, 1 *Sch. & Lef. 41*.

Where the obligation to perform rests upon one of the parties only, equity will enforce the contract with great caution. *Van Doren* v. *Robinson*, 1 *C. E. Gr. 256–260*; *Pinner* v. *Sharp*, 8 *C. E. Gr. 274–281*.

*Second.* Upon investigating the second question we find there is no question of title or doubt as to lines in any way expressed in any of the pleadings; whatever benefit the respondent could have had if the title was disputed in the proper place, and an issue taken upon that subject, has been lost by his method of pleading.

The chancellor, *per se*, has no right to determine the facts as to titles or lines; and the court of chancery must either send questions of disputed titles or lines, as to the facts, to a court of law for trial, or else try them by a commission appointed for that purpose. In support of this we cite and quote as follows: *Waddell* v. *Beach*, 1 *Stock. 793*; *Philhower* v. *Todd*, 3 *Stock. 54*; *Riverview Cemetery Co.* v. *Turner*, 9 *C. E. Gr. 18*; *Dickinson* v. *Stoel*, 4 *Hal. Ch. 294*; *C. & A. R. R.* v. *Stewart*, 3 *C. E. Gr. 489, 494*; *Manners* v. *Manners*, 1 *Gr. Ch. 385*.

In *Hickman* v. *McCook, 3 Humph. 640,* it is said : " I do not understand that it is insisted that a court of chancery has jurisdiction to try a mere simple legal title to land. That it has not is too well settled to admit of argument." To the same effect are *Alton M. & F. Ins. Co.* v. *Buckmaster, 13 Ill. 201 ; Seymour* v. *Delancy, Hopk. Ch. 436, 5 Cowen 704 ; Walcott* v. *Robbins, 26 Conn. 241 ; 1 Story Eq. Jur. § 616 ; Holcomb* v. *New Hope D. B. C., 1 Stock. 463 ; Miller* v. *Wack, Sax. 215 · Black* v. *Lamb, 1 Beas. 113.*

We admit that the court of chancery has jurisdiction in cases of confusion of boundaries, and to prevent a multiplicity of suits, and by special enactment in this state, under certain conditions, to quiet title, but we deny that either one of these grounds of jurisdiction exists in this case.

(1.) There is no confusion of boundaries, as the respondent is neither the owner, possessor nor claimant of any land which overlaps or runs into or beyond that of the appellant ; the lands in question are owned and possessed by another party, who has never had any dispute with the appellant in regard to any of his lines, and though he was a witness in the case did not even hint at a possibility of a dispute. The law, as to this point, is well set forth in *Godfrey* v. *Little, 1 Russ. & My. 59, 2 Russ. & My. 630.*

(2.) It is self-evident that there is or can be no pretence of " preventing a multiplicity of suits."

(3.) The conditions under which a bill for quieting title may, by special enactment, be brought, are not present in this case, as a cursory examination of the statute will show.

In regard to the last above-mentioned proposition, that the respondent should be compelled to perform his agreement as to the security that the improvements therein mentioned would be made or damages paid, we observe : It is one of the well-settled principles of a court of equity that a defendant, against whom a specific performance is sought, is allowed to prove, by parol evidence, what the agreement really was. Authorities on this point are so numerous that it appears almost unnecessary to cite them. *Woollam* v. *Hearn, 7 Ves. 211 ; 2 Lead. Cas. in Eq. (4th*

18

*Am. ed.) 924, and the English note on p. 929, and American note on p. 999 ; Miller* v. *Chetwood, 1 Gr. Ch. 199 ; Stoutenborg* v. *Tompkins, 1 Stock. 337.*

If there was a doubt that the substitution of more acres at the north for a deficiency at the south is not the specific performance of the contract sought to be enforced, but is a new contract made by the decision of the court—a contract which was not contemplated by the appellant, who did not propose to sell a strip out of the middle of his property—"the vendor will not be compelled to perform a different contract."

" A chancellor will not make a contract for the parties by compelling the vendor to do what he did not agree to, because he cannot do as he agreed." *2 Lead. Cas. in Eq. 1149 ; Morss* v. *Elmendorf, 11 Paige 277; 3 Pom. Eq. Jur. 452 § 1407 ; Waterman on Spec. Perf. § 425.*

*Mr. P. L. Voorhees,* for respondent.

The respondent has done all that he could to prepare to carry out the agreement; had made a survey of the land; had shown map to the appellant, at Harris's store at Toms River; had offered deed to him to be executed.

The preparation of the deed by the respondent was not required by the law of this state. *Stryker* v. *Vanderbilt, 3 Dutch. 68, 72 ; Egbert* v. *Chew, 2 Gr. 446 ; Huffman* v. *Hummer, 3 C. E. Gr. 83 ; Long* v. *Hartwell, 5 Vr. 126, 127.*

There was no objection made to the form of the deed by the appellant. If it was not correct he should have objected to it at the time it was presented for execution. *Stryker* v. *Vanderbilt, 3 Dutch. 68, 72 ; Todd* v. *Hoggart, 1 Moo. & M. 128 ; Hackett* v. *Huson, 3 Wend. 249.*

The appellant cannot take advantage of a delay which he himself caused. *Pom. on Cont.* §§ *405, 408,* notes and cases.

But, as shown, the agreement provided that lands should be conveyed &c. within thirty days from the date thereof. The date was Friday, the 17th day of September, A. D. 1880 ; thirty

days from that date includes the 17th day of October of that
year. The 17th day of October that year was Sunday. Submit
that when the time for the performance of a contract falls on
Sunday a compliance on the following day will be a sufficient
performance of the contract. *2 Pars. on Cont. 178 ; Chit. on Cont.
276, 676 ; Stryker* v. *Vanderbilt, 3 Dutch. 68.*

Specific performance of contracts may be enforced when the
agreement is signed only by one party. There may be a mutual
contract, to which both parties have given their assent, although
the evidence of such assent may exist in different forms as re-
gards the two parties ; as to one it may be verbal, while the other
is expressed by his signature in writing. *Fry on Spec. Perf.* §
*291 ; Waterman on Spec. Perf.* § *201 ; Pom. on Cont.* §§ *168,
170, 171 ; 3 Lead. Cas. in Eq. (ed. 1859) 93, 94.*

See this rule examined and sustained, with many cases cited
by Chancellor Kent in *Clason* v. *Bailey, 14 Johns. 484, 488,* (A.
D. *1817*).

Among other cases he cites *Hatton* v. *Gray, 1 Eq. Cas. Abr.
21, 2 Ch. Cas. 164 ; Coleman* v. *Upcot, 5 Vin. 527, pl. 17 ;
Buckhouse* v. *Crosby, 2 Eq. Cas. Abr. 32* § *44 ; Wilford* v.
*Bazely, 3 Atk. 503 ; Owen* v. *Davis, 1 Ves. 82 ; Cotton* v. *Lee,*
cited *2 Bro. C. C. 564 ; Seton* v. *Slade, 7 Ves. 265, 275 ; Fowle*
v. *Freeman, 9 Ves. 351 ; Wiston* v. *Russell, 3 Ves. & B. 192.*

After stating all objections to above rule, the chancellor closed
his argument by saying : " It appears from a review of the cases
that the point is too well settled to be now questioned."

The same rule has been adopted in this state. See *Lanning* v.
*Cole, 3 Gr. Ch. 229 ; Green* v. *Richards, 8 C. E. Gr. 32, 8 C.
E. Gr. 536 ; Reynolds* v. *O'Neil, 11 C. E. Gr. 223.*

A bond with a penalty to convey land will be specifically en-
forced against the obligor ; he cannot elect to convey or pay the
penalty. It is immaterial that the purchaser is not formally
bound, or has not performed the contract, if he offers so to do ;
performance on his part can be secured in the decree. *Pom. on
Cont.* § *50 ; Waterman on Spec. Perf.* §§ *23, 196, 201 ; Fry on
Spec. Perf.* §§ *67, 71, 72 ; Ewins* v. *Gordon, 49 N. H. 444 ;*

*Hooke* v. *Pynchon, 8 Gray 550 ; Vassault* v. *Edwards, 43 Cal. 458 ; Smith & Fluke's Appeal, 69 Pa. St. 474.*

When such contracts come to be enforced in equity, they cease to be unilateral, for upon filing the bill, the party who was before unbound put himself under all the obligations of the contract. By his own act he makes the contract mutual. *Richards* v. *Green, 8 C. E. Gr. 32, 536, 537 ; 3 Lead. Cas. in Eq. 94.*

The reference to a master in this case was proper. The contract contemplated that the land should be surveyed. It was for a tract containing one hundred and fifty acres, more or less, bounded south by Shreve's land, east by ocean, west by bay, and north by other lands of the appellant. The length is not given to any of the lines, and the contents could not be ascertained without a survey. The south, east and west lines are fixed; to find the northerly line a survey was necessary.

In note to § *159 of Pom. on Cont.,* it is said the master of the rolls, in *15 Beav. 513,* had held that if a surveyor going on the ground with the contract before him could ascertain accurately the land to be taken, the terms were sufficiently certain to be enforced.

The proper practice in such cases is a reference to a master to ascertain the lines of the land. See *Huffman* v. *Hummer, 3 C. E. Gr. 83, 91 ; Robeson* v. *Hornbaker, 2 Gr. Ch. 60.*

The opinion of the court was delivered by

Dixon, J.

The complainant in this case seeks the specific performance of a contract dated September 7th, 1880, by which the defendant agreed to convey to him, for $50 an acre, about one hundred and fifty acres of land lying in Ocean county between Barnegat bay and the sea.

The defendant resists the prayer of the bill on three grounds: First. Because the contract was not completely made, being signed by the defendant only. Second. Because the contract was obtained by fraudulent representations of the complainant, to the effect that he was acting for wealthy New York capitalists,

who would immediately make extensive and expensive improvements upon the property, costing in the neighborhood of $500,-000, to the great advantage of adjoining land owned by the defendant. Third. Because the complainant did not offer to perform his own part of the contract.

The first ground is not tenable. The signature of the complainant was not legally necessary. *Browne on Stat. of Frauds* §§ *365, 366.* The filing of the bill made the contract and the right to specific performance mutual. *Richards* v. *Green, 8 C. E. Gr. 536.* And the evidence satisfies us that it was not intended by the parties that signature of the contract by the complainant should be a condition precedent to its obligation.

As to the second ground. The contract, in terms, requires the complainant to expend $10,000 in improving the tract within one year, or, at the expiration of the year, to pay the defendant $5,000 additional price. This clause shows how far the parties intended that the subject-matter of the alleged representations should become obligatory parts of the bargain, but it does not, therefore, preclude the defendant from assailing the contract on account of the representations themselves beyond the limits of the stipulation; it is still permissible for him to prove that the representations influenced him in the negotiation, and that they were made *mala fide.* The complainant could not be compelled to realize the hopes which his statements had engendered, but it was essential to his bill that he had been honest in his dealings. It is, therefore, proper to inquire whether these representations were fraudulent. The dishonesty of the assertions made cannot be presumed, and we think it is not proved. The evidence indicates that the complainant was acting for others than himself, and there is nothing tending to prove that he had not fair ground for believing them to be such.as he stated, and to have such purposes as he declared. Hence this ground is not established.

The third reason for opposing the prayer of the bill is based on the following facts: The contract fixes the northerly boundary of the tract at the centre line of a block, or the centre line of a street, shown upon an annexed plan, as the one line or the other might be necessary to make the tract contain fully one

hundred and fifty acres, the complainant being required to take and pay for any surplus; the bill avers that after the signing of the contract the parties agreed that the tract should be made to contain one hundred and fifty acres, strict measure, the northern boundary to be located without regard to blocks or streets; the answer denies such a subsequent agreement, and the only evidence adduced · to establish it is oral testimony; this is legally incompetent to prove a change in the contract as to the land sold (*2 Taylor on Ev.* §§ *1144, 1145*); and the contract therefore remains as it was written. *Noble* v. *Ward, L. R.* (*2 Ex.*) *135*. When the complainant tendered to the defendant the balance of the purchase-money, which he was to pay on delivery of the conveyance, he produced a deed to be executed by the defendant, describing the land as he understood it to be according to the oral modification. The defendant insists that such a tender was insufficient. As, however, the defendant placed his refusal to accept the money and execute a conveyance, not on any objection to the description of the land, but solely on the ground that he had been deceived into making the original contract, and was not obliged to perform it, we think the complainant did enough to put the defendant in default, and to warrant the institution of his suit.

The complainant is entitled to specific performance of the written contract.

On the face of the decree and the opinion of the vice-chancellor,. some doubt arises whether it was intended to fix, by the decree, the location of the southerly boundary of the tract according to the surveys heretofore made by the complainant, or to leave the location to be ascertained by the master, on the reference, using those surveys as evidence, with whatever other proofs the parties may offer. We have concluded that the decree is not necessarily inconsistent with the latter course, which the opinion seems to favor, and which we deem to be proper. We also regard the decree as establishing the rights of the parties according to the articles of agreement, the written contract, unaltered by the alleged oral arrangement.

So construed, the decree is right, and should be affirmed.

*Decree unanimously affirmed.*